IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs January 10, 2006

## STATE OF TENNESSEE v. MICHAEL FORREST BANDY

**Direct Appeal from the Circuit Court for Tipton County**
**No. 4969     Joseph H. Walker, Judge**

_____

**No. W2005-01977-CCA-R3-CD  - Filed March 21, 2006**

_____

The defendant, Michael Forrest Bandy, appeals his convictions of first degree felony murder and aggravated child abuse, a Class A felony.  The sole issue on appeal is the sufficiency of the evidence.  Upon review, we conclude that the evidence is sufficient to support the convictions and affirm the same.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court Affirmed**

JOHN EVERETT WILLIAMS, J., delivered the opinion of the court, in which DAVID G. HAYES and ALAN E. GLENN, JJ., joined.

Gary F. Antrican, District Public Defender, and David S. Stockton, Assistant Public Defender, for the appellant, Michael Forrest Bandy.

Paul G. Summers, Attorney General and Reporter; David H. Findley, Assistant Attorney General; Elizabeth T. Rice, District Attorney General; and James W. Freeland, Jr. and Colin A. Campbell, Assistant District Attorneys General, for the appellee, State of Tennessee.

**OPINION**

The defendant was indicted for aggravated child abuse, a Class A felony, and for first degree felony murder.  A jury convicted the defendant on both counts.  The defendant was sentenced to life imprisonment on the second count conviction and to twenty years as a violent offender for aggravated child abuse.

Factual Background

This case concerns the death of Branden Tyler Johnson, a three and a half-year-old child, while in the care of the defendant.  Chasity Fay Ross, the victim's mother, testified that she lived with the defendant and her three children at the time of the victim's death.  The two other children

were Dylan, then two months old, and Landon, who was thirteen months old. Only Dylan was fathered by the defendant. Ms. Ross stated that she left the children with a neighbor, Samantha Taylor, at 1:45 p.m. on July 30, 2004. The victim appeared normal and healthy when she left the children. Ms. Ross worked at a convenience store about three miles from her home. The defendant called Ms. Ross between 5:00 and 6:00 p.m. The boys were crying, but the defendant assured her they were all right. The defendant called Ms. Ross again at approximately 9:50 p.m. He stated that the victim was not moving. The defendant also said he had dropped the victim while placing him in bed. Ms. Ross told the defendant to call 911, and she left work. When she arrived home, the defendant was outside smoking a cigarette. She found the victim unconscious on his bed with his legs off the side. Ms. Ross called 911, and a response team arrived shortly thereafter. The team members attempted unsuccessfully to revive the victim and removed him to the Baptist-Tipton Hospital.

Samantha Taylor lived across the street from Ms. Ross and babysat the children on the day of the victim's death. She stated that the victim was playful that day and made no complaint of any pain. Ms. Taylor took the children home to the defendant's care at approximately 5:00 p.m. The defendant remarked that he would not beat the children with a belt or hit them in the face.

Ray Deneka was a paramedic with the ambulance service that responded to the 911 call from Ms. Ross. He stated that he arrived at 10:10 p.m. and met a fireman carrying the victim from the residence. Upon examination, the victim showed no vital signs, pulse, heartbeat, or spontaneous respiration. CPR was attempted, but the victim never exhibited any consciousness or signs of life.

Pam Ford-Simpson, an investigator for the Covington Police Department, responded to the Ross residence on the night of July 30th. Officer Ford-Simpson asked the defendant what had happened. The defendant told her that while placing another child in the bed with the victim, he noticed that the victim "did not move right."

The defendant gave a signed statement in his handwriting to another officer on the scene. The statement was as follows:

> At approximately 17:30 I arrived at home, and shortly after that Sam brought the kids to me. I changed in the restroom, and shortly thereafter I fed the children, Landon, Tyler, then proceeded to watch TV. At about 19:30 to 20:00 hours I placed the children in bed. At 21:20 I went to check on the children, and at that time I noticed Tyler was not responding properly. At about 21:50 I called Chasity, and she arrived shortly thereafter. And at approximately 22:10 the ambulance arrived.

The statement had a notation of the time it was given as 20:20. Officer Ford-Simpson agreed on cross-examination that the time was incorrectly written.

Melissa Bandy was formerly married to the defendant and had four children by him. Ms. Bandy identified a letter written to Ms. Ross by the defendant as the defendant's handwriting. Within the letter, the defendant gives an account of his interaction with the victim on the night of the victim's death. Ms. Bandy read the following excerpt from the six-page letter:

> I got Tyler and wrestled with him.  Then I pinned him and quit.
> I do the same things with the boys all the time, one of three things, either a rock
> bottom, pedigree, or a choke slam, oh and power bomb.  This time I had done a rock
> bottom and went to pin him and then picked him up, you know, how they do on TV
> sometimes.  So I picked him up after that, and then I did a choke slam on him.  When
> I did that, he hit and did not move, he just went limp, and I just shook him.

Ms. Bandy also testified that the defendant had told her he "didn't care much" for the victim and had referred to the victim as "a piece of shit."

Roger Moore was, on the night of the victim's death, an officer for the Covington Police Department.  He had taken the defendant's statement which was referenced in Investigator Ford-Simpson's testimony.  Officer Moore said that the entire statement, including the notation of the time of statement, was written by the defendant.  Officer Moore agreed that the time written, 20:20 (8:20 p.m.), was incorrect as he did not arrive on the scene until after 10:00 p.m.  He also stated that the defendant did not appear to be "under the influence."

Tanya Poteet, the Director of Medical Records for Lakeside Behavioral Health, was a State's witness.  Ms. Poteet testified that the defendant presented himself to the psychiatric substance abuse hospital on July 31, 2004.  In the admission records, the defendant stated as his chief complaint, "Don't know how to handle my problems.  Been through so much in life."  Under a section titled, "Precipitating Events," the defendant reported that he had three beers the night before, was carrying his girlfriend's three-year-old son to bed, tripped over clothes, and dropped the boy.  He later learned that the boy had died.  On cross-examination, Ms. Poteet stated that the records reflected that the defendant had tested positive for the presence of cannaboids and also that he had expressed suicidal intentions.

Elise Tanner was the assessor for incoming patients at Lakeside Hospital.  Ms. Tanner stated that she had done the initial assessment of the defendant on July 31, 2004.  She had asked the defendant what event or events caused him to present himself for admission.  The defendant told her that he had tripped over strewn clothing and fallen while carrying the victim.  The victim had struck his head on a door frame.  Ms. Poteet stated that she believed the defendant was suffering from major depression and that the defendant admitted to suicidal thoughts.

Linda Gamblin was an investigator for the Covington Police Department and had responded to the Ross residence on July 30th.  The defendant had told her that night that while placing another child in bed, he had noticed that the victim was "not moving right."  The defendant was arrested after his release from Lakeside on August 2nd.  The defendant gave a signed statement which reads in pertinent part as follows:

> It was an accident, and we were wrestling.  I know sometimes I get rough.
> I wrestle with my own kids.  We were wrestling on the mattress that was on the
> living room floor.  I was wrestling with him, and I wrestle on my knees.

I did a choke slam on Tyler. One hand was on the front part of his neck, and the other hand was on his back, and I choke slammed him into the mattress. He didn't move after that. I tried to shake him and tried to splash water on his face in the bathroom. After that I took him and laid him on the bed and I tried CPR. I was scared to call 911 because I didn't know what had happened. So after I couldn't get him to wake up, I checked, and he was still breathing, and his heart was beating.

He was making gurgling sounds, and so I called Chasity to come home. His mouth was open, and his tongue was moving. Landon was sleeping in the bed. When Chasity got home Tyler was lying on the bed with Landon, which is where I placed him when he wouldn't wake up. When Chasity got home she went into the bedroom and tried to get Tyler to wake up. I followed her in there. She had picked him up and was trying to get him awake. She put Tyler on the mattress in the living room, and she called 911. She called 911 twice.

Investigator Gamblin stated that she wrote the account in her handwriting. The defendant reviewed it, made one change, and signed the statement.

Dr. Bruce Phillip Levy, a forensic pathologist who serves as the Chief Medical Examiner for the State of Tennessee, testified as an expert in forensic pathology. From the autopsy performed on the victim, Dr. Levy's major findings of pathological diagnoses were: blunt force injuries of the head, neck, and torso. Superficial injuries to the extremities were also found. Dr. Levy ascribed the cause of death to the multiple blunt force injuries to the head and torso. He stated the manner of death was homicide and the circumstances of death as a battered child.

More specifically, Dr. Levy stated that he found eight injuries to the victim's face area and three areas of bleeding beneath the scalp. The internal bleeding areas were related to a contusion above the left eye, the top left side of the head, and a third on the right top back side of the head. On the victim's torso were areas of bruising on the chest, abdomen, and back. Dr. Levy found internal bleeding in the intestinal mesentery, the area that supports the intestines. The internal injuries to the head and the mesentery were the most serious injuries. Based on the autopsy examination, Dr. Levy stated "these injuries occurred . . . at or near the time of (the victim's) death, within a matter of several hours at the most." Dr. Levy found no "pattern injuries" such as would be present from striking a door frame.

After the State concluded its proof, the defendant testified as the sole defense witness. The defendant recounted the events leading to the victim's death. He stated that he started drinking shortly after arriving home at 5:00 to 5:30 p.m. He said that he performed several wrestling maneuvers on the victim including what he identified as a "choke slam," "body slam," "hip toss," and a "rock bottom." The defendant first recognized a problem with the victim after the victim was administered the "choke slam." The defendant denied any anger toward or any intent to injure the victim.

During cross-examination, the defendant admitted that his written statement on July 30th, the oral statement to Investigator Ford-Simpson, and his account to Lakeside personnel were all false accounts. The defendant admitted telling his former wife that he punched the victim in the stomach on prior occasions to make him quiet. However, the defendant denied the truthfulness of the statement. The defendant did not feel that drinking or smoking marijuana that evening had impaired him.

Analysis

The defendant poses the only issue on appeal in the following manner: "whether the evidence in the record is sufficient, as a matter of law, to sustain the conviction for first degree felony murder based upon aggravated child abuse." The defendant argues that the proof adduced was insufficient to show that the defendant acted "knowingly" as opposed to accidentally in causing the victim's fatal injuries.

Our inquiry when reviewing a challenge to the sufficiency of the evidence is whether, considering the evidence in a light most favorable to the State, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. See Jackson v. Virginia, 443 U.S. 307, 99 S. Ct. 2781 (1979); State v. Hall, 8 S.W.3d 593, 599 (Tenn. 1999); Tenn. R. App. P. 13(e). Because a verdict of guilt removes the presumption of innocence and imposes a presumption of guilt, the burden shifts to the defendant upon conviction to show why the evidence is insufficient to support the verdict. See State v. Evans, 108 S.W.3d 231, 237 (Tenn. 2003); State v. Carruthers, 35 S.W.3d 516, 557-58 (Tenn. 2000). On appeal, the State is entitled to the strongest legitimate view of the trial evidence and all reasonable and legitimate inferences which may be drawn from the evidence. State v. Smith, 24 S.W.3d 274, 279 (Tenn. 2000).

A verdict of guilt by the trier of fact resolves all conflicts in the evidence in favor of the prosecution's theory. See State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997). "Questions about the credibility of witnesses, the weight and value of the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact, and this Court does not re-weigh or re-evaluate the evidence." Evans, 108 S.W.3d at 236 (citing Bland, 958 S.W.2d at 659). Nor may this Court substitute its own inferences drawn from circumstantial evidence for those drawn by the trier of fact. Evans, 108 S.W.3d at 236-37.

To convict the defendant for felony murder, the State was required to prove that the defendant killed the victim in the perpetration of aggravated child abuse. T.C.A. § 39-13-202(a)(2). The killing must be done "in pursuance of the [felony] and not collaterally to it." State v. Pierce, 23 S.W.2d 289, 294 (Tenn. 2001) (quoting Farmer v. State, 296 S.W.2d 879, 883 (1956)). It is not required of the State to prove the defendant intended to kill, only that he intended to commit the underlying felony. T.C.A. § 39-13-202(b). Aggravated child abuse occurs when the "act of abuse results in the serious bodily injury to the child." T.C.A. § 39-15-402(a)(1). A person commits child abuse "who knowingly, other than by accidental means, treats a child under eighteen (18) years of age in such a manner as to inflict injury." T.C.A. § 39-15-401(a). Serious bodily injury is defined

as bodily injury which involves a substantial risk of death, protracted unconsciousness, extreme physical pain, protracted or obvious disfigurement or protracted loss or substantial impairment of a function of a bodily member, organ or mental faculty. T.C.A. § 39-11-106(a)(34).

Circumstantial evidence alone may be sufficient to support a conviction. State v. Tharpe, 726 S.W.2d 896, 899-900 (Tenn. 1987). The circumstantial evidence, however, must exclude every other reasonable theory or hypothesis other than guilt. Id. at 900.

Whether the victim's injuries were inflicted knowingly or accidentally is a question of fact for the jury. Intent is seldom proved by direct evidence and may therefore be deduced by the trier of fact from the nature and character of the offense and from all of the circumstances surrounding the offense. See State v. Inlow, 52 S.W.3d 101, 104-05 (Tenn. Crim. App. 2000).

The medical evidence established that the victim died as a result of multiple blunt force injuries to the victim's head and torso. It is undisputed that these injuries occurred while the victim was in the care of the defendant. The defendant admitted to giving evasive and outright false accounts of the circumstances of the victim's injuries. At trial the defendant testified that he was merely engaging in horseplay with the victim in administering various wrestling maneuvers which all seemed to share a commonality, that the victim was tossed and slammed. It was well within the jury's prerogative to reject the defendant's claim that the injuries were inflicted accidentally. It was equally within the jury's province to adopt the medical expert's opinion that the injuries were not accidental but were knowingly inflicted. After viewing the evidence in a light most favorable to the prosecution, we conclude that the evidence supports the defendant's convictions for first degree felony murder and aggravated child abuse.

_____
JOHN EVERETT WILLIAMS, JUDGE